was the victim of trial by ambush. Despite repeated efforts to discover the factual basis of the government's case, Stanford heard for the first time at trial about incriminating meetings and conversations that never occurred. He could not impeach this false testimony because he was caught by surprise. This is the issue, the Brady-Napoo issue, that I would like to focus on today, although I'd be happy to answer questions about the erroneous McFadden jury instruction as well. It's not that I don't think the McFadden issue has merit. I certainly do. I just think the briefs are more exhaustive on that. But if there are any questions, I'd be happy to take them. Before trial, Stanford asked for a bill of particulars, Brady and Jake's material, and reports of witness interviews. He adopted a co-defendant's motion asking for the government to identify Brady material in the 70,000 pages of unsearchable discovery. The result was a generic order that the government turn over Jenks and Brady material within the time allowed by the scheduling order. That did not work. Stanford never got the witness interview reports. The prosecutor avoided turning them over under the circumstances. They didn't submit the reports to the witness to be read and approved, and they interpreted Brady to reach direct contradiction only. We know this because of the interchange at the hearing in the motion of the bill of particulars, 2013, quoted in the government's brief, pages 77 to 78. The prosecutor said what was critical to his case was Stanford training the employees at the December 7th meeting, and he would turn over, had turned over, or would turn over anything where the employees said Stanford had not trained them. Well, of course, we also know that Brady extends to documents in which the employees name other people as training them, but don't list Stanford. Brady ruling was just that there was no showing that it was suppressed. It wasn't this distinction between Giglio and direct impeachment, right? The district court said, I don't see that you've shown me that Brady exists. Was that right, correct? And the reason that was wrong, incorrect, was because there were some serious inconsistencies in the government's theory of the case, and in the testimony that it presented, changed over time. As of 2013, the theory of the case was that it was not you trained employees on how to evade law enforcement at this December 7th meeting. At trial, the theory of the case was you protected everybody. You made everybody feel protected by saying you had an attorney general letter, and that's what enabled them to continue selling these drugs. Now, when you have a big change in the theory of the case, obviously the information that you have as the government changes. The original theory expressed in 2013 was after Brady and Espinoza had pled guilty and been debriefed. After that hearing, then Buswell pled guilty and was debriefed, and that's, I think, what things changed. They didn't put Buswell on the stand, but they got Barrow and Espinoza to confirm things that he said, and that's a change. That's inconsistency that could have been used at trial to undercut the government's entire theory of the case. But it doesn't happen the night before when you're prepping your witnesses. Excuse me? How do you know that this information didn't come about when you're prepping your witnesses the night before or two nights before? Well, that's still exculpatory if they didn't tell them before. If you had multiple interviews and you first learn of it the night before trial, that's, the defense is entitled to learn of it. What is the exculpatory information here? Anything that's inconsistent. No, but here, what was it? Here the exculpatory information was the information that would have enabled him, Stanford, to impeach the government's case. What was that? I had three examples. One, there was a September 22nd conference call with Don Warshafter, the national legal expert who had always practiced, for 20 years, synthetic cannabinoid law. The government found this incriminating enough to play the whole thing 40 minutes before the jury. Stanford was not in on the telephone conversation, but Francis testified that he spoke with him by phone, discussed it afterwards. In fact, the telephone records showed that there were no telephone calls between Francis and Stanford until November 8th. Now, you don't wait seven weeks to discuss a telephone conference that had happened before. The problem with arguing inconsistencies based on telephone and bank records is your client had those. So then you're in a situation saying, well, we had them, or they gave them to us, but they gave them to us imperfectly. In other words, most of NAPU and Brady law, except in extreme circumstances, doesn't find reversible error when the defendant actually possessed the material they're saying was suppressed and not given to them. Well, my understanding, especially of NAPU law, is that the government has the obligation to correct false testimony unless the defendant consciously decided not to use it. And that's San Filippo cited in our reply brief, and there's a case called U.S. v. Mason 293. Besides Barham, where the government elicits a question, did you have any promises, and they say, the witness says no, and everyone actually knew there was a non-prosecution agreement. Can you think of any case we've ever written where the defendant had the material they're saying proved the lie? The defendant could have . . . Stanford could have used it if he had had the witness interview reports. I can't think of any case where they didn't give them before trial in skilling . . . That's connecting the NAPU-Brady to the 26.2 Jenks law, right? That's saying, well, let's get back to the Jenks issue. We don't . . . they didn't give you any reports of interviews? None. None. I think there were initial interviews of employees who didn't testify in the stores. And you didn't have none of their witnesses testified by the grand jury? You didn't get any grand jury testimony? No. No. We had nothing. It was a complete surprise. He gets to trial, and they tell these stories about meetings that never . . . and conversations that never existed. The government does point out that a . . . and I know your client was pro se at trial, but almost all of Jenks case law says you have to then say to the court, please look at it in camera. I don't think they're right that it's not verbatim or that he didn't improve it, but there doesn't seem to be any contemporaries' request at this trial to say, judge, look at this and you decide if it's disclosable. Well, judge, I don't think . . . I don't know . . . I don't think that the defendant has the obligation to ask the court to look at it, because only the defendant is going to know if it's impeachment material or not. Right, but our law is very clear. A generalized request for Jenks material. We're not raising a Jenks claim. I'm saying because he did not get the witness interview reports, which were Brady material, because there was embellishment over time, he was unable to prepare his defense and was unable to impeach the false testimony . . . the false testimony that was presented against him. I was looking at Skilling the other night, and they talked about just not outlining the an error, but they said, you have to look at how did the government use the purportedly false testimony or the material . . . the purportedly false testimony, and here it was their theory of the case. They argued it to the jury, and they said, was there indicia of bad faith? And I think this case reeked of bad faith on the part of the government. One, they refused to turn over the witness interview reports. Two, they misled Stanford about the factual basis of the case by focusing on this training on December 7th, when that turned out to be just the tail end of what the case was about. That's a pretty serious allegation. And I'm making it, Judge. I'm making it. They double teamed him at the bench each time. Throughout trial, they demanded that he turn over impeachment material at the beginning of the day, even though that was not within the scope of Rule 16. And the judge went along with that. This is a cumulative error argument? Well, I'm saying there was bad faith, which reinforces my Brady argument, my Brady and Napu argument, that yes, Stanford had the material, but the government went out of the way to prevent him from using it. Because by not giving him the witness interview reports, you can't sit there and hear... What's your best case that has that sort of amalgam to prove a Brady reversal? Because that's a complicated, interlacing argument. I'm wondering if you have any that's similar. I have not seen cases under Brady where the government, usually it comes up under Jenks, that the government didn't turn... You're not pushing the Jenks argument. Right, because the law in this circuit is too bad, although in United States v. Palermo, an old case right after Jenks, the dissent said, if we interpret this too narrowly to require reading and approval by witnesses, it's going to encourage prosecutorial misconduct. Throughout the trial, and this really, really disabled Stanford from thinking clearly the whole time, the government was going after him for not presenting his impeachment evidence beforehand, and you're not required to do that, but the court in this case went along with the government, and it got the court really aggravated at Stanford. The government, the prosecutors would repeatedly challenge the authenticity of the defense exhibits, which turned out to be perfectly authentic, and would challenge whether Stanford had given to them when they had. They went into, they doubted the authenticity of the documents because his secretary had a prior fraud conviction, and then they went into the facts of the fraud conviction, just to prejudice the judge against him and make it harder. With your time running, I am curious about the McFadden argument. Yes. We would be applying Nader. We would be assessing whether the instruction was harmless or not. Correct. Beyond a reasonable doubt. Okay. And even though the jury had this unanimous Sienter finding, and even though Stanford was able to argue in closing that I didn't know this was a controlled substance, you're saying because the jury wasn't required to find that special finding beyond a reasonable doubt, it couldn't be harmless. First of all, the form of the inquiry. The court went out of its way to distinguish it from an inquiry about, for an answer on a verdict. You're entitled to a verdict on every element of the offense. The court went out of its way to say, this is separate apart, this is different, this is just to assist the court, and then it didn't give the beyond a reasonable doubt instruction. I mean, arguably that separate question focused the jury more on this issue than if you just picked it off as one of the elements, wouldn't it? It focuses the jury on it, but it told the jury this is not part of your verdict. And there was no need to do that. It's not typically how those things are done, but the government asked for it to be done that way. Usually you just ask a question after the count. But weren't there general instructions about the burden on the government and how the defense doesn't have to put on a case and all the usual boilerplate instructions? Correct, as it went to the verdict. But this was distinguished from the verdict. Also, I think it's very important that the judge stopped Stanford from questioning Dan Francis on when he realized it was a controlled substance analog, because Dan Francis was the only one who would have told that to Stanford. And Dan Francis was going around like, well, I don't know, what do you mean about that question? Because he did not believe at the time it was a controlled substance analog. And he was not allowed to answer that question. And I think that really hurt Stanford. The evidence... Stanford still argued that Eubinger had gotten out in closing, right? That Eubinger said that... You know, the Eubinger thing came later. I have a hard time understanding... That was a revocation based on state law. Again, you're conflating federal and state law. You can't infer bad intent from knowledge under state law, because state law was broader than federal law. In your McFadden argument, it's very clear in the brief you limit that to count one. But the Mappu-Brady arguments, you think, would affect all... Is that correct? Everything. That's correct. McFadden is just count one. Yes. On the money laundering, the jury was told it could find whatever it wanted, criminally derived from anything. I think there probably should have been an instruction that it had to be unanimous on what it found, so we don't really know. But that was not preserved below, so I didn't argue that. I've got 17 seconds. Just on the sentencing issues, that's on remand in Malone Green. And if you don't intend to grant a new trial, we would probably ask that you hold this in advance and take supplemental briefs when that's done. Thank you very much. Thank you, Ms. Shobart. Ms. Domang? May it please the Court, I'm Camille Domang. I represent the United States, who's the appellee in this case. And unless the Court would prefer me to do otherwise, I'll follow the order that defense counsel did, beginning with the Brady-Napiew issue. And the first thing I would like to address is sort of the broad notion that this was trial by ambush against Mr. Stanford, that Mr. Stanford was intentionally misled by the government as to what his role was in this particular conspiracy. And I think the best evidence of that, the thing I would suggest that you look at, is the government's opening statement from the first trial. This case was started twice and finished once. The first trial was in April, some four-plus months before the trial that ultimately resulted in the conviction. And that, of course, was a mistrial when the co-defendant died. Look at the government's opening statement from that first trial, and you will see that there is no practical difference in the government's involvement in this conspiracy was, the nature of his involvement. And that's a very detailed opening statement. And again, this is four months before the trial that ultimately resulted in his conviction. So even assuming he had been misled up to that point, he's got four months and an opening statement to say, wow, the government's going to elicit information about this meeting and that meeting. Again, look at the opening statement. It talks about specific meetings. They may have given him their theory of the case at opening statement. But I want to know exactly what the discovery was given here. Because this is a multi-year conspiracy investigation. And you end up getting multiple defendants to flip on their lawyer and testify. So is it the government's position? There was not a single report of an interview with a single co-defendant that was turned over? Judge, I don't think the record reflects. When you ask counsel that question, I don't think the record reflects whether there were any interview reports turned over. What the record reflects was... I'm asking you as an officer of the court. Do I know? Did the government ever give a single report of an interview over to the defendant? As to co-conspirators who opted to testify later, I don't think so, Your Honor. That's my knowledge. So, I mean, I've never seen that. So you're saying in years of investigation, these people either were never interviewed, or if they were interviewed, no reports of interview were taken? Or if they were interviewed and reports were taken, the agent never testified and nothing in the report? Yes, that's it? It's that. You have reports. So therefore, the government looked at them and concluded nothing verbatim was mentioned? Well, first, let me say this, Your Honor, that these co-conspirators came on to the you know, that we were cultivating these people as witnesses for years while this investigation went on. A lot of these co-conspirators signed on late. I think Dan Francis signed on very late. And I don't, I apologize... I mean, I've never seen a case where a co-conspirator isn't interviewed. I take it they weren't put in the grand jury. So is your testimony, is your position also that the government agents that took those interviews didn't go into the grand jury? The, it's my testimony that, or it's my position that those interview statements, the ones that were made, were not Jenks or Brady. And if they're not Jenks or Brady... My question is, did any agent that took any interview report go into the grand jury? To get the indictment or to... Yeah, to get the indictment. Co-conspirators testified in the grand jury, to the best of my knowledge. I know. Okay, so if the agent goes in, then did the agent testify? He, certainly, to obtain the grand jury indictment. You would have given the grand jury testimony of the interviewing agent, correct? Not if he didn't testify at trial. It's not Jenks material. So he... No. So that's it. The people that took the interviews never testified at trial, and they didn't go into the grand jury. There was a, there was a state task force agent who worked on the DEA task force. He testified at trial on a very, on sort of very narrow conduct. So if he would have had any Jenks material that was, you know, related to the subject of his testimony, then that would have been turned over. And again, I don't think the argument here is a Jenks violation. I don't think that's what we're talking about here. We're talking about a Brady-Napieu violation. Don DeSalvo was a DEA agent who testified at trial, but he was not a case agent. So I'm trying to answer your question about how many federal agents testified at trial, and there were only two. And one was not even a federal agent. Even if it's not discoverable under 26.2, even if it's not technically Jenks, you would have to review every single one of those statements for possible Brady-Giglio. Correct. And you would have to do it before trial and then after each witness's testimony. Correct. And that's what happened here. Yes. And there's even a proceeding at which the magistrate judge and government counsel engage in a colloquy, and this is quoted either in my brief or in defense counsel's brief, where the magistrate judge says, what happens if you have a statement that says, Daniel Stanford didn't do anything for me, didn't teach me anything, didn't do anything? And government counsel says, oh, well, that's Brady. And the magistrate says, are you going to turn that, are you going to sit on that? That's his expression. And government counsel says, oh, no, we're going to turn that over, meaning we're going to turn that over right away. That's just exculpatory. Again, I've never seen not handing over reports of interviews of a cooperating defendant. So you understand it's not just exculpatory. If the interview report day one said, oh, I was involved, but not that much. Correct. And then later on when he's getting ready for trial, I was involved a little more. That's impeachment evidence of that cooperating defendant. You would have to give over those reports of interview, yes? Yeah. Well, to the extent that it would be favorable to the defense, that it would be some sort of impeachment. Any time a cooperating defendant's story changes, it's favorable to the defendant. Well, and I think the issue is changes. And with the defendant, it's really speculation. The defendant says, well, gosh, people were interviewed many times. Obviously, their story changes many times. But the case law is that mere speculation is not enough. And as you pointed out, the district court in this particular case made a finding that the defense had not proved that there was favorable material that had been suppressed. It's clear under Fifth Circuit law, and I think this is what defense counsel was referring to, the Martino case, which is a case that's got some age on it, that the government has no obligation to create janks material. So the agents could have interviewed these people a hundred times, and they were not under an obligation to create reports of those particular interviews. Sometimes they do, sometimes they don't. As Judge Davis points out, many times these people are interviewed days before trial. These defendants live some distance away from Lafayette. Some of them, as I said, signed on late. So as the agents are interviewing these people, I'll tell you in my experience, having done trial work before I started doing appeals, there are, you know, that's trial prep. This is not, we're not investigating a case anymore. This is trial prep. And so, you know, I think what the district court relied on was that there was nothing but speculation that there was ever, all of these inconsistencies that the defendants suspected were out there, that there were actually any inconsistencies. One witness was asked, I think on cross-examination, how many times were you interviewed by the government? And, you know, did your story change over time? And he said, no. He said, well... It seems like the record shows that several witnesses said, oh, when I was being interviewed, people were writing down notes. I think there were two witnesses who said that someone took notes. But that's not going to be verbatim. And as you pointed out, he could have asked for in-camera review. If he ever, if he ever believed that some 302 or DEA-6 was a verbatim recitation, he could have asked for in-camera review. And that's the Edwards case. And I can find no indication anywhere in this record that the defendant ever asked for in-camera review. You know, if he had the same problem with Brady, he could have asked for in-camera review. What about counsel's argument that the theory of the case against the defendant changed, which indicates that the witnesses must have changed their story along the way? And that's my argument, Judge, on the opening statement. I think the best evidence in the record of the government's theory not changing is the opening statement from the first trial. And if you read it, it is a long opening statement. I think it's somewhere between 35 and 40 pages of record. And it's very detailed. And it talks about this meeting, and then they had that meeting, and then Francis had the meeting where he told them about all of this. And it talks about the AG letter. It is very clear from that first opening statement that the government's theory on Stanford's participation in the conspiracy was that he was valuable because he's the one who had the in with the state attorney general. And, you know, he had the letter, which then later became a handshake agreement. And so he's the one who had the in, and that was his value to the conspiracy. And that is very clear from the opening statement in the first trial. So I would suggest to you there's really nothing but speculation that the government's theory of prosecution ever changed in this particular case. I want to touch on the idea that there's no problem with a theory changing if several witnesses start a new trial, new theory, as long as you've given over-appropriate discovery. Correct. Correct. I think that's right. And it wouldn't have been a problem. But, you know, you would have to have something out there that would say, some report of interview or notes or something where some witness said, only thing Daniel Stanford ever did was train me at this particular meeting. And then later, oh, well, no, he went to this meeting, he went to that meeting. And I agree with you, Judge, that that would be useful impeachment because it would show that the witness had changed his story over time. But the record reflects or rather, there's nothing in the record suggesting that that existed. And Stanford never tried to test that by asking the district court to look. The task agent that took most of the interview notes, he didn't testify at pretrial, at detention, at sentencing because Jenks is owed. Sure. All of those. Sure. He was just never put in. No, I think he did different pretrial. This is, you know, the record in this case is whenever he testified, your position is that the interview reports that related to that testimony were given over to the extent that there was something that was relevant. I don't think there's been a suggestion otherwise. Again, there's not an argument in this case about a Jenks violation. Counsel just said that. So, you know, to my knowledge, the record doesn't suggest otherwise. And I don't think there's been an accusation that he would have testified at a motion to a government witness gets on the stand and says something that you know is untrue, but they have the information that could impeach that statement. It's still the government's obligation to interrupt. I think that's correct. If we know something is wrong, but there are two issues here. And the first is, you know, as a point sort of recognized in O'Keeffe, and Judge, I know you're very familiar with O'Keeffe from working on that case before you were a judge. But one of the things that O'Keeffe recognizes is that defense attorneys, and in this case the defendant and defense attorney were one and the same, make strategic decisions. So, for example, and, you know, I'll go ahead and make this point now. It's what I wanted to make later. He did have this information. He had the bank records. The bank records were the government's exhibits that were offered in connection with the money laundering counts. He had the bank records. Presumably he had his own telephone records. We didn't offer those, but he presumably had access to his own telephone records. And I'll get to in a minute whether he was prevented from using the records of his law practice, because that's a small evidentiary point. But he had these. And he didn't even try. So it's not like, you know, I'm going to try with this particular bank record. Didn't even try. And what O'Keeffe recognizes is sometimes that happens for strategic reasons. Let's say, for example, that Mr. Stanford had pulled out a bank record trying to show that Mr. Barrow actually wasn't in Lafayette at a given day. Well, here, Mr. Barrow, look at this bank record. You know, what's Barrow, the number one rule of cross-examination is never ask a question you don't know the answer to. Barrow could have said, I have, I put that on a credit card. I paid cash for it. So what O'Keeffe recognizes is sometimes, you know, you have to allow the defense attorney to make strategic decisions about what he's going to do with potential impeachment material. And again, never try to impeach with the telephone records. Never try to impeach with the bank records. I would suggest that the bank records really don't tell us where people were and weren't. What the record reflects in this case is that these defendants had numerous bank accounts. I mean, the co-conspirators had numerous bank accounts. And what Mr. Stanford's really focusing on is about one set, the Wells Fargo accounts. But they had, you know, the Money Lawn, there's an Exhibit 369, sort of a compilation of all these bank accounts. I think Pinnacle had four. Alpha, which is Espinoza's company, had two. They had multiple bank accounts, not to mention cash, credit cards. So I'm not sure the bank accounts really are exculpatory in the sense that they say, well, this witness was obviously lying because this is not in a bank record. But he never even tried. Never even tried to impeach with those. She makes the point that he was prevented by the government and the district court from using some other documents that might have impeached the witnesses. I think what Stanford's talking about are records from his own law practice. And the government had very serious authenticity concerns about documents that came out of Mr. Stanford's law practice. The discussion about the custodian of records was off the record, not before the jury. But, you know, pointed out to the court judge, you know, his custodian. He would have had his own records. And if they weren't admitted, those are evidentiary rulings that aren't before us that I see. They aren't. But she's trying to make the argument, I mean, defense counsel is trying to make the argument that he was precluded from using these particular records. The objection was to foundation under 902 only. The judge specifically said, look at 17582, ROA 17582. The judge says you can't get him in under 902 because you haven't complied with the notice requirement of 902, but just call a records custodian. Mr. Stanford never called his records custodian. Up until the last day of testimony, he was still talking about calling his records custodian, but he never did it. And that's why those documents didn't come in. It looks to me like, you know, maybe because of our own law, but count one has real infirmity. Is your position primarily that it's harmless? Yes. Our position on count one as to the McFadden instruction, the McFadden error in the jury instruction is that it's harmless. Because, you know, McFadden says the government can prove knowledge of the controlled substance analog two ways. And the first is by showing the defendant knew it was a controlled substance analog. The jury interrogatory, which the judge specifically utilized because it was concerned about the circuit split. The McFadden cert grant hadn't happened yet, but, you know, the court was aware that you had Turcotte from the Seventh Circuit, so there was a circuit split. So the court says, let's not try this case again. Let's use this jury interrogatory. And the jury interrogatory asks, during the time alleged in the conspiracy, do you find that Daniel Stanford knew AM 2201 was a controlled substance analog? Not was it illegal? Was it prohibited? Was it a controlled substance analog? And that is the first means of proof under McFadden. The jury answers yes. The judge tells the jury, you have to be unanimous on this, just like you have to on everything else. And as Judge Davis points out, it's at the end, which arguably draws perhaps more attention to it. Plus, the court says this is intended as an aid to the court. You know, what jury is not going to seriously take a question that the court says this will be an aid to the court? What about a standard of proof as to that? Yes. And that is the problem. The problem with the interrogatory is it's silent on the standard of proof. Our argument is that the only standard of proof anywhere in the instructions is beyond a reasonable doubt. I cite Brown from the Ninth Circuit, which is a case in which the beyond a reasonable doubt was omitted in a portion of the instruction, but it was covered seven other times. In our case, beyond a reasonable doubt appears 12 times in the totality of the instructions. But Judge Foote also said to the jury, this is unrelated. Yes. Yes. It's confusing. It is, perhaps, except that there's no other standard of proof. And that was the problem in Gorin, which is the First Circuit case I cited by means of comparison. In Gorin, the — there was an issue on which the court should have instructed on the preponderance standard. It didn't. And the only standard of proof was beyond a reasonable doubt. And the court says, we know they could have gotten confused because — or they wouldn't have known because the only standard is beyond a reasonable doubt. In this case, the only standard anywhere in the instructions is beyond a reasonable doubt. Do you agree with Dvorak, the special instruction specific — Absolutely. Absolutely. And Dvorak was a better interrogatory. I mean, I can't — I'm not going to stand up here and tell you that we had a — that the interrogatory was perfect. I think if the interrogatory was like Dvorak, we might not be talking about this today. But you know, these things happen. If the jury had said no, it would be error, right? Yeah. Or if the question hadn't been asked, we'd have reversible error. So that special interrogatory and its integrity is crucial. I won't concede the second part, Judge, because we do make an argument that there is — there is substantial other evidence from which the jury could have found knowledge. You know, my suggestion is that when it comes to whether this was a contested element, going back to sort of my earlier argument on opening statement, look at opening statement, look at closing argument, Stanford's defense is not what I would call the franchisee's defense. The franchisee's defense is, I entered into an agreement with these people to sell this stuff, but I didn't know it was controlled. Stanford's argument is, I never entered into any sort of agreement. I was on the periphery because I was a lawyer hired to do a job. If — I either didn't attend these meetings, if I was there, I got there late and left early, nobody ever told me anything, I never saw any lab reports, and there's no such thing as an AG letter. So your accounts are separate entirely from — Yes. Yes. Absolutely. I think if there's a McFadden problem, it affects only count one. It doesn't affect the misbranding conspiracy, and it doesn't affect anything to do with money laundering in light of Pettigrew, a case I cite in my brief on the money laundering count. Okay. Thank you, Ms. Domingue. Back to you, Ms. Shulberg. Few points on rebuttal. The opening statement at the first trial put the timing of the attorney general letter at late October and November. Now, again, that's very different than at the first trial where — at the actual trial, the second trial where they said it's in August, where Barrow said it first came in in August. And that makes a big difference in terms of whether building this business relied on Stanford. By August, they were selling six figures, $380,000 every month. And Barrow made the decision to invest in a warehouse in Lafayette on September 29th. So finding out — talk about an AG letter in late October or November does not alert him to what's going on. In the first opening statement, they said that the people in Atlanta, Green and Malone, knew that Pinnacle was protected by two attorneys but didn't know their name. At trial, Green testified to their name. Now, obviously, something changed, and we never got a report on that. As to the other witnesses pleading — pleading, coming in late, they came in — Green, Malone came in, pled in 2012, before this 2013 hearing. O'Keefe is completely different because the defense attorney used the records that he was complaining about being NAPA material in pretrial litigation, so he clearly knew and understood everything about them. Howard Stanford had made a strategic decision not to use the only records that could help him. I mean, the judge admonished him for ineffective cross-examination, so it clearly was not a strategic decision. The bank records don't just show, oh, he was not in Lafayette on this day. They show where he was on these days. There are only a few exceptions in each month. So that's very different in terms of the bank records' strength as impeachment material. They show he was somewhere else. He wasn't in Lafayette. In camera instruction, there was nothing personal or confidential in these reports, and short of that, I don't think Stanford had the obligation to ask the judge to figure out if it would be impeachment material. What are you going to do? Have a judge, after every direct examination, go through all these statements? There was testimony that people were interviewed multiple times. She's going to sit there at the bench after direct on each of these witnesses and see if there was anything he could use, and plus, it's really defense counsel who is best situated to figure out whether there's something he could use. And finally, oh, he never called his record custodian because he didn't want the government, I would think, to bring out that she had a prior conviction. I don't think he wanted to embarrass her. And he was pretty overwhelmed at that point by what he considers a plethora of false evidence. On the McFadden issue, the cases where the court has had so far where there was an interrogatory about an omitted jury instruction, the issue was not hotly contested. For the most part, Dvorak is an example. The jury effectively made the finding when it found on the elements that were not omitted. For example, Dvorak was Medicaid ID, it was health care fraud or aggravated identity theft. And he didn't, the omitted element was, was this a real person? Well, to get a Medicaid ID, you had to be a real person, so the jury effectively found that. This is the first case that I've seen where the issue was hotly contested, and frankly, the government evidence was very, very weak. DEA said they didn't know yet. They hadn't decided yet. Francis said the science is not there. Those, each of those propositions is, because I was trying to track them down. The DEA agent that you quote that said, we didn't know yet, what he really said was, I didn't know because I didn't join the DEA until 2012. He was assigned to look at the para, the second thing. But when he says I didn't know and you cited for the DEA didn't know, it's because he's very careful to say I hadn't joined the DEA yet. Right, but he was, he was hired to do that, to make that study. And I think Booz said at one point, well, if you had called, we would have said, well, maybe it's possible. And you had, you had Stanford being taped, saying, look, I trusted these people, I was wrong, excuse me, I gotta stop, I was wrong. You make sure that if you want to continue this, that the police have the stuff and have checked it out. Thank you, I'd ask you to reverse on all counts. All right, thank you, counsel, and thank you for an excellent argument.